Brian Miller
MORRISON, SHERWOOD, WILSON, & DEOLA, PLLP
401 North Last Chance Gulch
Helena, MT  59601
406-442-3261 Phone
406-443-7294 Fax
bmiller@mswdlaw.com


*Attorneys for Plaintiffs*


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| TOM REED and JERRY REED,<br><br>Plaintiffs,<br><br>v.<br><br>BRENDAN BEATTY, in his official capacity as the Director of the Montana Department of Revenue,<br><br>Defendant. | Case No. CV-23-51-H-BMM-KLD<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

I. Introduction..................................................................................1

II. The Reeds have satisfied the "injury in fact" requirement for standing..........3

    a. The Reeds' injury is not speculative .......................................3

    b. The Reeds' Claims are Ripe ................................................11

III. The Court should not stay this case under the Pullman Doctrine ...............13

IV. Conclusion .................................................................................20

CERTIFICATE OF COMPLIANCE .................................................23

# TABLE OF AUTHORITIES

## CASES

Association of Public Agency Customers v. Bonneville Power Administration,
 733 F.3d (9th Cir. 2013) ...................................................................5

Bishop Paiute Tribe v. Inyo County,
 863 F.3d 11144, (9th Cir. 2017) ........................................................6

City of Los Angeles v. Lyons,
 461 U.S. 95, (1983)...........................................................................8

City of Philadelphia v. New Jersey,
 437 U.S. 617, (1978)....................................................................1, 16

Clapper v. Amnesty International USA,
 568 U.S. 398,(2013)..........................................................................9

Courthouse News Serv. v. Planet,
 750 F.3d 776 (9th Cir. 2014) ..........................................................13

East Bay Sanctuary Covenant v. Trump,
 950 F.3d 1242 (9th Cir. 2020) .....................................................5, 13

Hawaii Housing Authority v. Midkiff,
 467 U.S. 229, (1984)...................................................................14, 18

Lowe v. of Detroit,
 2021 WL 2471476 (E.D. Mich. June 17, 2021) ..............................1

Lujan v. Defenders of Wildlife,
 504 U.S. 555 (1992)......................................................................6, 8

Northeast Patients Group v. United Cannabis Patients & Caregivers of Maine,
 45 F.4th 542, (1st Cir. 2022)...............................................1, 17, 19

Original Investments, LLC, v. Oklahoma,
 2021 WL 1026950 (W.D. Ok. March 17, 2021) ..............................1

Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Devel. Comm'n,
 461 U.S. 190, S. Ct. 1713,L. Ed. 2d 752 (1983)............................................12

Patel v. City of Los Angeles,
 594 F. App'x 415 (9th Cir. 2015)...................................................................17

Richardson v. City & County of Honolulu,
 124 F.3d 1150 (9ᵗʰ Cir. 1997) .......................................................................11

Ripplinger v. Collins,
 868 F.2d 1043, (9th Cir. 1989) ..........................................................13, 14, 17

S.C. State Highway Dep't. v. Barnwell Bros., Inc.,
 303 U.S. 177, 185 n.2, 58 S. Ct. 510, L. Ed. 734 (1938)...............................20

Saenz v. Roe,
 526 U.S. 489,  (1999)..................................................................................3, 14

Sierra Club v. Morton,
 405 U.S. 727 (1972)..........................................................................................7

Slaughter-House Cases,
 83 U.S. 36, Wall. 36 ........................................................................................3

Sporhase v. Nebraska,
 458 U.S. 941, (1982).......................................................................................16

Susan B. Anthony List v. Driehaus,
 573 U.S. 149, (2014).........................................................................................9

Tenn Wine and Spirits Retailers Association v. Thomas,
 139 S.Ct. 2449, (2019)........................................................................2, 15, 19

## STATUTES

28 U.S.C. § 2201 (a)..........................................................................................11

Section 16-12-203(2)(g), MCA...................................................................passim

## CONSTITUTIONAL PROVISIONS

Fourteenth Amendment.....................................................................2, 15

Come now Plaintiffs Tom and Jerry Reed and file this response in opposition to Defendant's motion to dismiss. (ECF Doc. 29).

## I.    Introduction

This case is not about whether anyone has a "fundamental right" to grow marijuana. Instead, it is simply about whether the State of Montana, under Section 16-12-203(2)(g), MCA, has the right to place restrictions on U.S. Citizens who have resided in Montana for less than 1 year from participating in a domestic recreational marijuana market as investors or operators in a manner which likely violates either the Commerce Clause, Privileges and Immunities Clause, or both.

Several other federal courts have already determined that such restrictions violate the Commerce Clause and must be enjoined.  *Northeast Patients Group v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 547-48 (1st Cir. 2022); *Lowe v. of Detroit*, 2021 WL 2471476 (E.D. Mich. June 17, 2021); *Original Investments, LLC, v. Oklahoma*, 2021 WL 1026950 (W.D. Ok. March 17, 2021). Although the Department is extremely dismissive of the important national policy expressed in the Commerce Clause, federal courts take the matter with far greater seriousness.  "[W]here simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). Such a restriction on out-of-state participation in the domestic Montana market can only survive a

constitutional challenge if it is "narrowly tailored to 'advanc[e] a legitimate local purpose". *Tenn Wine and Spirits Retailers Association v. Thomas*, 139 S.Ct. 2449, 2461 (2019).   The Commerce Clause expressly prohibits states from engaging in "unalloyed protectionism".  *Tenn. Wine*, 139 S.Ct. at 2474.

Similarly, the magnitude of the rights afforded to citizens under the Privileges and Immunities Clause cannot be lightly abridged.  Again, while the Department may not take such interests very seriously in an effort to protect its right to operate as it sees fit, federal courts take a much different view.

> Despite fundamentally differing views concerning the coverage of the Privileges or Immunities Clause of the Fourteenth Amendment, most notably expressed in the majority and dissenting opinions in the Slaughter-House Cases, 83 U.S. 36, 16 Wall. 36, 21 L. Ed. 394 (1873), it has always been common ground that this Clause protects the third component of the right to travel. Writing for the majority in the Slaughter-House Cases, Justice Miller explained that  one of the privileges conferred by this Clause "is that a citizen of the United States can, of his own volition,  become a citizen of any State of the Union by a bona fide residence therein, with the same rights as other citizens of that State." Id., at 80. Justice Bradley, in dissent, used even stronger language to make the same point:
>
> > "The states have not now, if they ever had, any power to restrict their citizenship to any classes or persons. A citizen of the United States has a perfect constitutional right to go to and reside in any State he chooses, and to claim citizenship therein, and an equality of rights with every other citizen; and the whole power of the nation is pledged to sustain him in that right. He is not bound to cringe to any superior, or to pray for any act of grace, as a means of enjoying all the rights and privileges enjoyed by other citizens." Id., at 112-113.

> That newly arrived citizens "have two political capacities, one state
> and one federal," adds special force to their claim that they have the
> same rights as others who share their citizenship.

*Saenz v. Roe*, 526 U.S. 489, 503-04 (1999) (quoting *Slaughter-House Cases*, 83 U.S. 36, 16 Wall. 36).

This case presents important constitutional questions which should be decided by a federal court in the first instance.  While the Reeds have also filed separate state court lawsuits challenging Section 16-12-203(2)(g), MCA, on totally separate grounds in an effort to cover their bases and protect their interests, the existence of those suits does not lessen the importance of this one.  The Department's motion should be DENIED and the case should move forward.

**II. The Reeds have satisfied the "injury in fact" requirement for standing**

　　　　　*a.  The Reeds' injury is not speculative*

The Department argues that the Reeds injuries are "speculative" and will not be sufficiently concrete to confer standing until the underlying administrative proceedings involving Therapeutic Essentials actually results in a revocation of the Therapeutic Essentials' license and the shutdown of their operations. *Department's Brief*, pg. 9.   This argument is incorrect.

Rightly or wrongly, the Reeds have invested substantial sums in the Montana recreational marijuana market.  They have been operating under a license owned by Therapeutic Essentials.  Therapeutic Essentials is now subject to

revocation proceedings before the Office of Dispute Resolution for the Department of Revenue.  While the Reeds fully and completely support Therapeutic Essentials and hope that its license will not be suspended or revoked, they would like to obtain their own license in order to ensure they can avoid a trainwreck before it actually happens.  Because Tom Reed lives out-of-state, and Jerry Reed will be a resident for less than one year, Section 16-12-203(2)(g), MCA's 1-year residency requirement completely bars them from applying for their own license and avoiding the economic injury that will occur if the license for Therapeutic Essentials is revoked.

Furthermore, even if Therapeutic Essentials is able to avoid the revocation or suspension of its license, the fact remains that the Department will still consider the Reeds unable to participate in the market because they have not resided in Montana for more than 1 year, and will still attempt to shutter their operations on that ground.  Clearly, the issues driving this lawsuit are here to stay and should be resolved by this Court.

"An injury-in-fact is 'an invasion of a legally protected interest,' but this means an interest that is only concrete and particularized and actual or imminent—not an interest protected by statute. This distinction prevents Article III standing requirements from collapsing into the merits of a plaintiff's claim; a petitioner's 'legally protected interest' need not be a statutorily created interest, and

a plaintiff can have standing despite losing on the merits." *East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1267 (9th Cir. 2020) (citations and quotations omitted). "Injury in fact is a judicially cognizable interest— implying that an interest can support standing even if it is not protected by law . . . so long as it is the sort of interest that courts think to be of sufficient moment to justify judicial intervention." Id. (internal citations and quotations omitted). "[E]conomic injury is generally a legally protected interest." *Association of Public Agency Customers v. Bonneville Power Administration*, 733 F.3d 939, 951 (9th Cir. 2013).

The Department contends that revocation or suspension of Therapeutic Essentials license is a *fait accompli* and certain to occur; thus, we can say in this particular case that the Department itself is the agent of the harm.[1]  Because of the facts of the Reeds' situation in the Montana recreational market, and the intention of the Department to invoke Section 16-12-203(2)(g), MCA, against them, the basic requirement for a concrete, non-speculative injury is satisfied; the Reeds **do not** have to demonstrate success on the merits to satisfy the requirement of a concrete, non-speculative injury.  "Allegations that support a 'threat' to a 'concrete interest as actual and imminent' are sufficient to allege an injury in fact that meets the requirements of constitutional ripeness." *Bishop Paiute Tribe v. Inyo County*,

---

[1] Unless the Department will stipulate that it will not invoke Section 16-12-203(2)(g), MCA, as a basis to deny the Reeds the opportunity to obtain a license, it should not be allowed to disavow the adverse effects created by its decisions.

863 F.3d 11144, 1154 (9th Cir. 2017).  The threat presented by the proceedings against Therapeutic Essentials is a very concrete form of harm for the Reeds, and they should have an opportunity to stop that harm from becoming real damage if the legal cause of the harm (Section 16-12-203(2)(g), MCA) is unconstitutional.

The Department cites to the classic Supreme Court decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), for the proposition that " 'some day' intentions -- without any description of concrete plans, or indeed even any specification of *when* the some day will be -- do not support a finding of the 'actual or imminent' injury that our cases require."  *Department's Brief*, pg. 10 (citing *Lujan*, 504 U.S. at 564.  But if we consider the facts of *Lujan* as compared with the facts of this case, we see why the "some day" rationale discussed in *Lujan* does not apply here at all, and why *Lujan* shows that the requirement for "imminent", "non-speculative" injury has been met with the allegations presented in the Reeds' complaint.

In *Lujan*, plaintiffs challenged a rule promulgated by the Secretary of Interior under the Endangered Species Act. *Lujan*, 504 U.S. at 557-58.  The rule determined that the ESA only applied to actions taken in the United States or on the high seas, which was a reversal from a previous determination that the ESA extended "to actions taken in foreign nations".  *Lujan*, 504 U.S. at 558.  The Plaintiffs wanted the ESA to apply to foreign nations again.

The Plaintiffs argued they had standing to challenge the rule based on the fact that they had observed certain animal species (including endangered nile crocodiles, elephants, and leopards) on trips to foreign countries such as Egypt and Sri Lanka in the past. *Lujan*, 504 U.S. at 555. The Plaintiffs contended that they planned to travel to these countries in the future and hoped to observe these animals again. *Id.* They did not, however, know exactly when they planned to make these return trips or even if they *could* make them based on the geopolitical uncertainties of the time. *Lujan*, 504 U.S. at 563-64.

The Court recognized that the desire to view wildlife in natural habitats did indeed constitute the type of cognizable interest that confers standing. "Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562-63 (citing *Sierra Club v. Morton*, 405 U.S. 727 734-35 (1972)). However, the plaintiffs failed to meet the standing requirements because they could not show that they would be "among the injured". *Lujan*, 504 U.S. at 563 (citing *Sierra Club*, 405 U.S. at 734-35). "That the women 'had visited' the areas of the projects before the projects commenced proves nothing. As we have said in a related context, 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.' And the affiants' profession of an 'intent' to return to the places they had

7

visited before -- where they will presumably, this time, be deprived of the

opportunity to observe animals of the endangered species -- is simply not enough."

*Lujan*, 504 U.S. at 564 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102

(1983)).  The Court went on to say that,

> Our insistence upon these established requirements of standing does not
> mean that we would, as the dissent contends, "demand . . . detailed
> descriptions" of damages, such as a "nightly schedule of attempted
> activities" from plaintiffs alleging loss of consortium. *Post*, at 593. That
> case and the others posited by the dissent all involve *actual* harm; the
> existence of standing is clear, though the precise extent of harm remains
> to be determined at trial. Where there is no actual harm, however, its
> imminence (though not its precise extent) must be established.

*Lujan*, 504 U.S. at 564.

The Reeds' actual situation is nothing like the peripatetic wildlife observers

in *Lujan*.  The Reeds have actual skin in the game here.  They want to avoid actual

harm that the Department seems determined to inflict by revoking or suspending

Therapeutic Essentials' license. They want to avoid the trainwreck before it

happens by getting themselves onto another track. If viewing wildlife in foreign

countries constitutes a cognizable interest sufficient to confer standing, the

interests that will be damaged if the Reeds' ability to operate in the recreational

market surely is shuttered surely do as well.

The Department wants to prevent the Reeds from mitigating their actual

harm by applying for another license, and wants to force them to wait until they are

actually injured before they can invoke the protections of the U.S. Constitution. But "injury-in-fact" does not require the Reeds to wait until they are unconstitutionally punched in the face by the State in order to have the type of concrete and particularized harm required for standing so that they can prevent the blow from landing. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (holding that "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."). This case is not one of those situations where the harm will only manifest if a "highly attenuated chain of possibilities" comes to pass. *Clapper v. Amnesty International USA*, 568 U.S. 398, 410. (2013). And even if Therapeutic Essentials makes it through the revocation proceedings, the Department will still attempt to stop the Reeds from operating in Montana if they are unable to comply with the 1-year residency requirement in Section 16-12-203(2)(g), MCA. The Department's insistence on applying Section 16-12-203(2)(g), MCA's unconstitutional residency requirements is precisely the type of "continuing, present adverse effects" giving rise to an "imminent" harm sufficient to confer standing. The Department's position, coupled with the situation in which the Reeds find themselves today, give rise to an impeding or "substantial risk" of injury by the unconstitutional application of Section 16-12-203(2)(g), MCA, against them. *Susan B. Anthony List*, 573 U.S. at 158.

In this connection, the Department misses the point of the present lawsuit. The Reeds are not asking this Court to declare they are entitled to a license.  They are just asking this Court to declare that the Department cannot use an unconstitutional means to stop them from doing so.   As noted above and in the previous briefing on the preliminary injunction at ECF Doc. 5, several other federal courts have already struck down laws that are identical to Section 16-12-203(2)(g), MCA, on the grounds that the laws violated the Commerce Clause. These Courts clearly deemed the exercise of judicial scrutiny to be important, and not simply a waste of everyone's time.   While the Department may not think the interests embodied in the Commerce Clause or Privileges and Immunities Clause are worthwhile, that should not surprise the Court as states have historically resisted the limitations these provisions have placed upon their exercise of power. And while the Department seems determined to find some other, independent state law basis upon which to deny the Reeds' the opportunity to apply for a license, that does not moot the concrete nature and importance of the limited controversy before the Court at present.

Along these same lines, the Department is incorrect when it attempts to convince the Court that there can be no standing unless complete and full relief (i.e., the granting of a license) is the result of this proceeding.  The Court is only being asked to pass judgment on the constitutionality of Section 16-12-203(2)(g),

MCA, and nothing more.  The fact that some additional relief could be sought by the Reeds, is of no moment to the propriety of this action— a declaratory judgment action is proper "whether or not further relief is or could be sought." 28 U.S.C. § 2201 (a).

### b. The Reeds' claims are ripe

The fact that a revocation proceeding is underway against Therapeutic Essentials, creates a degree of urgency for the Reeds to find an alternative license under which they can operate.  They cannot avail themselves of this option so long as Section 16-12-203(2)(g), MCA, stands in their way.   The Department has made clear that it will enforce this provision and that it will rely upon it to prohibit the Reeds from operating under any other licenses, until they have been residents in Montana for at least 1 year.  If Therapeutic Essentials survives the revocation proceeding, another round will be sure to follow since the Department wants to enforce Section 16-12-203(2)(g), MCA, against the Reeds.  Because of the adversity created by the facts of this case, the nature of the interests involved, and the Department's insistence on the constitutionality and enforceability of Section 16-12-203(2)(g), MCA, the Reeds' claims are ripe.

As stated in *Richardson v. City & County of Honolulu*, 124 F.3d 1150 (9th Cir. 1997), "[w]hether a claim is ripe generally turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration.  The 'central concern [of the ripeness inquiry] is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Richardson*, 124 F.3d at 1160 (citing *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Devel. Comm'n*, 461 U.S. 190, 201, 103 S. Ct. 1713, 1720, 75 L. Ed. 2d 752 (1983); 13A Charles Alan Wright et al., Federal Practice and Procedure § 3532 at 112 (2d ed. 1984)).  The constitutionality of Section 16-12-203(2)(g), MCA, is certainly ripe.  While the Department has generated arguments in a self-serving attempt to moot this controversy and delay a court decision, the question of whether Section 16-12-203(2)(g), MCA, presents a real constitutional question whose merits need to be decided.   Withholding the resolution of this question would certainly cause great hardship to the Reeds because this issue is not going away for them.  So long as the Department insists that this statue is constitutional, the conflict cannot be avoided and should be resolved.

Implicit in the Department's argument is the notion that the constitutionality of this statute cannot be challenged by the Reeds unless and until they prove that their non-compliance with Section 16-12-203(2)(g), MCA, is the only reason why they cannot obtain a license.  But this argument puts the cart before the horse.  For purposes of ripeness and injury-in-fact at this stage, whether or not the operation of other statutes actually bars the Reeds from obtaining another license for relief is

not at issue.  *See East Bay Sanctuary Covenant*, 950 F.3d at 1267 (standing should

not be permitted to "collaps[e] into [an analysis of] the merits of a plaintiff's claim

. . .").  This Court can declare the statute at issue unconstitutional thereby affording

complete relief on the action presented to it for consideration.  The Reeds do not

need to convince the Court that Section 16-12-203(2)(g), MCA, is the *only*

impediment at this time towards their ability to obtain another license before

ripeness of the claim exists and the Court can grant relief.  As stated by the Ninth

Circuit, a plaintiff can have standing "despite losing on the merits".  *East Bay*

*Sanctuary Covenant*, 950 F.3d at 1267. "Whether [plaintiffs] have a sufficient

statutory or otherwise legal basis for their claims is irrelevant at this threshold

stage." *Id.*, at 1267-68.

### III.    The Court should not stay this case under the *Pullman* Doctrine

The Department misapplies and misinterprets the *Pullman* abstention

doctrine. "Pullman abstention is an extraordinary and narrow exception to the duty

of a district court to adjudicate a controversy." *Courthouse News Serv. v. Planet*,

750 F.3d 776, 783 (9th Cir. 2014).   It is the exception rather than the rule.

*Ripplinger v. Collins*, 868 F.2d 1043, 1048 (9th Cir. 1989).  *Pullman* abstention is

not to be invoked just because the case might be a difficult one.  "[T]he relevant

inquiry is not whether there is a bare, though unlikely, possibility that state

courts might render adjudication of the federal question unnecessary. Rather, [we]

have frequently emphasized that abstention is not to be ordered unless the statutes of an uncertain nature, and is obviously susceptible of a limiting construction. These statutes are not of an uncertain nature and have no reasonable limiting construction. Therefore, Pullman abstention is unnecessary." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 237 (1984).

The first factor under *Pullman* abstention is whether "the complaint touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." *Ripplinger*, 868 F.3d at 1048. The Department as not satisfied this factor. While the Department frames this case solely around its own concerns in a state marijuana market, and its ability to engage in experiments within the federally illegal market, the constitutional interests represented by the Commerce Clause and Privileges and Immunities Clause carry far more gravity from the federal perspective.

Jerry Reed, for instance, is in the process of moving to Montana and will have established residency soon.  His rights under the Privileges and Immunities Clause are weighty and cannot be lightly abridged. U.S. Supreme Court precedent interpreting the Privileges and Immunities Clause of the U.S. Constitution, particularly in light of the Fourteenth Amendment, prohibits states from denying privileges to U.S. Citizens who exercise their "right to move into another State and become a resident of that State." *Saenz v. Roe*, 526 U.S. 489, 502 (1999).  The

right of a newly arrived citizen to enjoy the same rights as other citizens in that state, is "protected not only by the new arrival's status as a state citizen, but also by her status as a citizen of the United States." *Saenz*, 526 U.S. at 502.  The Citizenship Clause of the <u>Fourteenth Amendment</u> expressly equates citizenship with residence: 'That Clause does not provide for, and does not allow for, degrees of citizenship based on length of residence.'" *Saenz*, 526 U.S. at 506.

This is an area of federal concern with which this Court should intervene particularly in situations such as this one when the State's actions give rise to a strong inference of economic protectionism which has no justification at all.  There is a well-established historical tension within the Republic between the narrow self-interests of States (who would be inclined to protect their own interests) and the broader National interest in ensuring that state protectionism does not abridge individual liberties.  The States themselves are not entrusted with policing that relationship, instead it is solely the province of the federal courts. *See Tenn. Wine and Spirits Retailers Association v. Thomas*, 139 S. Ct. 2449, 2460 (2019) ("the <u>Commerce Clause</u> by its own force restricts state protectionism is deeply rooted in our case law. And without the dormant <u>Commerce Clause</u>, we would be left with a constitutional scheme that those who framed and ratified the Constitution would surely find surprising . . . That is so because removing state trade barriers was a principal reason for the adoption of the Constitution. Under the

Articles of Confederation, States notoriously obstructed the interstate shipment of goods. . .  In light of this background, it would be strange if the Constitution contained no provision curbing state protectionism, and at this point in the Court's history, no provision other than the <u>Commerce Clause</u> could easily do the job.").

While the Department may not be concerned if its laws engage in the type of economic protectionism that the Commerce Clause was enacted to prohibit, the Supreme Court has been clear that there is a virtually "per se" rule against economic protectionism.  *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).  Because of this, a Congressional intent to allow state protectionism must be clearly expressed.  *See Sporhase v. Nebraska*, 458 U.S. 941, 960 (1982) ("In the instances in which we have found such consent, Congress' "'intent and policy' to sustain state legislation from attack under the <u>Commerce Clause</u>" was "'expressly stated.'").  While Department may be focused on looking out for the State's interests in keeping economic protectionist policies in place, the Commerce Clause has something important to say about those issues and was enacted by the Founders to prohibit precisely the kind of conduct that the State of Montana is engaging in here.

Furthermore, it strains credulity for the Department to argue that a federal court would find Montana's interest in setting up a federally illegal market to be an area of "sensitive social policy" which should incline it to overlook the importance

16

of the Commerce Clause and Privileges and Immunities Clause.  From the federal

point of view, Montana has no valid interest in setting up markets which violate

federal law.  While it is bizarre and weird that such things are happening in 2023,

the Court should not be drawn into these flimsy arguments and instead stand firmly

with the values reflected in the U.S. Constitution in order to ensure that they have

real legal meaning.[2]

Not only has the Department has failed to demonstrate entitlement to

abstention under the first factor, but the same is true with respect to the second and

third factors as well.  Factor two is whether "a definitive ruling on the state issue

would terminate the controversy," and factor three is whether the "possibly

determinative issue of state law is doubtful".  *Rippinger*, 868 F.2d at 1048.

Regardless of how a State Court interprets Section 16-12-203(2)(g), MCA, the

construction of the statute from a federal perspective (i.e., whether it runs afoul of

the Commerce Clause or Privileges and Immunities Clause) should only be

interpreted by a federal court with respect to the application of federal

constitutional questions.  Any state court interpretations of the law at issue here,

would not affect the construction of the law from a federal perspective under either

the Commerce Clause or Privileges and Immunities Clause.  Additionally, the fact

---

[2] In *Northeast Patients Group*, the First Circuit expressly rejected the idea that the federally illegality of marijuana had any impact on the constitutional questions presented by a Commerce Clause analysis.  *NPG* 45 F.4th at 547-48.

that there is an administrative proceeding involving Therapeutic Essentials at which some facts might be developed which pertain to the dispute between the Reeds and the Department does not provide a basis upon which to invoke abstention. See Patel v. City of Los Angeles, 594 F. App'x 415 (9th Cir. 2015) ("While the facts found in a state mandamus action may have issue preclusive effect in a subsequent federal proceeding, that alone is insufficient to justify [Pullman] abstention.").  Similarly, a federal court does not need to abstain merely because there exists the abstract possibility that state courts might render adjudication of the federal question unnecessary.  *Hawaii Housing Authority v. Midkiff,* 467 U.S. at 237. This Court has no idea how or when a state court might act on the issue before it.  Moreover, any rulings on the meaning of a state constitutional law would have absolutely no bearing on whether Section 16-12-203(2)(g), MCA, passes muster under the U.S. Constitution.

The Department has not presented a coherent argument as to why this Court should abstain under *Pullman*.  All three factors are not satisfied here.  The federal constitutional issues are not trivial, and it makes no sense to say that the State of Montana has a unique interest in its federally illegal domestic market that can be invoked as a basis to limit the operation of the U.S. Constitution.  Indeed, Congress has not even authorized Montana to establish any marijuana market at all—as the Department has repeatedly noted in its briefing.  That being the case, why does the

Department believe that a federal court should give the State leeway to operate in an unconstitutional manner just because it is operating in a federally unlawful manner as well? A state-created market in a federally illegal substances is not an area where the federal government recognizes any sensitive social policy at all.

Furthermore, the Department has not explained how a potential state court construction of Section 16-12-203(2)(g), MCA, would have any impact on how the law is construed with respect to the Commerce Clause or Privileges and Immunities Clause.  A state court decision on the construction and application of the Montana Constitution to Section 16-12-203(2)(g), MCA, would have no impact on the role of a federal court in interpreting the statute. Accordingly, factors two and three of the *Pullman* abstention doctrine have not been satisfied.

The legal relationship between Montana and the Feds on the issue of recreational marijuana is certainly weird, and it is unfortunate that the Legislative and Executive Branches are having a difficult time getting their act together in a way that harmonize state and federal law.  But whatever Congress and the Executive may or may not be doing does not have any impact on whether this Court should make a determination as to the applicability of the U.S. Constitution in this case.  From the perspective of the U.S. Constitution, the fact that Congress has or has not acted does not in any way lessen the impact of the Commerce Clause or the Privileges and Immunities Clause as the cases cited above make

clear.[3]  That being the case, the only legitimate interests in this case are that the federally protected constitutional rights of the Reeds not be violated.

The State has no interest in the operation of its domestic marijuana market which could possibly supersede the interests of the U.S Constitution.   See, e.g., *Northeast Patients Group*, 45 F.4th at 542 (" . . . the democratic process at the state level does not in and of itself function as an effective restraint against protectionist state laws because the burdens that such laws impose will fall on actors who are unrepresented in state legislatures. "[W]hen the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state.") ((citing  S.C. State Highway Dep't. v. Barnwell Bros., Inc., 303 U.S. 177, 185 n.2, 58 S. Ct. 510, 82 L. Ed. 734 (1938)).   Since the founding of the Republic, States have always tried to justify economic protectionism, which is exactly why a federal court—not a state one—is the forum in which these types of claims should be heard.

### IV.    Conclusion

---

[3] In *Northeast Patients Group*, the First Circuit effectively dismantled the notion that the Commerce Clause requires a positive act of Congress to have meaning. *NPG*, 45 F.4th at 548.  ("the question before us is not whether the CSA preempts the residency requirement in the Medical Marijuana Act. It is whether the residency requirement cannot stand because it transgresses the dormant Commerce Clause due to the substantial burden that this requirement (in light of its patently protectionist nature) imposes on interstate commerce."

The injury-in-fact requirement has been satisfied.  If the viewing of foreign wildlife constitutes a cognizable interest sufficient to confer standing, then the Reeds' interest in avoiding the shuttering of the operations in Montana does as well.  Because the Reeds do not presently satisfy the 1-year residency requirement in Section 16-12-203(2)(g), MCA, they cannot apply for their own license.  They have a right to seek removal of this obstacle under the Declaratory Judgments Act in federal court.

The harm is imminent and the case before the Court is ripe.  Even if Therapeutic Essentials gets through the revocation proceeding, the Department will take another run at shutting down the Reeds operations under Section 16-12-203(2)(g), MCA.  That much has been made clear by the position they have taken in this litigation.  The Department is not backing down on its view that Section 16-12-203(2)(g), MCA, is constitutional.  If the Department wants to stipulate that it will not seek to enforce this provision against the Reeds, then perhaps the necessity of this suit can be obviated.  But unless that occurs, all the requirements for standing have been satisfied.  The Department's stated position here certainly indicates at a minimum the existence of a "substantial risk" that Section 16-12-203(2)(g), MCA, will be used against the Reeds by the Department to stop them from operating.

The Department has not satisfied all three elements of the *Pullman* abstention doctrine.  Under factor one, Montana's interest in operating a domestic marijuana market which is illegal under federal law should mean nothing to a federal court; the only thing that should matter here is whether Montana's scheme of regulation is constitutional under the Supremacy Clause.  Under factors two and three, there is nothing that a state court could add or subtract with respect to the constitutional issues presented by Section 16-12-203(2)(g), MCA, that would or should incline this Court to abstain from rendering its judgment.  These statutes could be constitutional under state law, while still being constitutional under federal law; similarly, the laws could be unconstitutional under both state and federal law at the same time.  Either set of facts is insufficient to justify invoking of *Pullman* abstention.  Since the Department has not satisfied all three factors, the request for abstention should be denied.

The questions presented by this constitutional challenge to Section 16-12-203(2)(g), MCA, are not abstract, speculative, remote, or hypothetical.  They are real questions which will have an effect on the actual relations between the Department and the Reeds.  While it is possible that a ruling on this issue would not resolve all issues that the Department may decide to come up with, those concerns are themselves to speculative and remote to provide a basis for this Court

to decline jurisdiction and dismiss the case.  For these reasons, the motion to

dismiss should be DENIED.

DATED this 1st day of November, 2023.

By:   /s/ Brian Miller
Brian Miller
MORRISON SHERWOOD WILSON DEOLA PLLP
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E) of the Montana Federal Local Rules of

Procedure, I certify that the foregoing document is printed with a proportionately

spaced Times New Roman text typeface of 14 points; is double spaced; and the

word count calculated by Microsoft Word 2018 for Mac is 5572 excluding caption,

tables and certificate of compliance.

DATED this 1st day of November, 2023.

By:   /s/ Brian Miller
Brian Miller

MORRISON SHERWOOD WILSON DEOLA PLLP
*Attorneys for Plaintiffs*